# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TIMOTHY S. DAUBERT | ) | 1:09-CV-1463 GSA |
| | ) | |
| | ) | ORDER RE: CROSS MOTIONS FOR |
| Plaintiff, | ) | SUMMARY JUDGMENT |
| | ) | |
| v. | ) | |
| | ) | (Docs. 69 and 70) |
| | ) | |
| LINDSAY UNIFIED SCHOOL DISTRICT, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**I.     Introduction**

Pending before the Court is Lindsay Unified School District's ("Defendant" or "the district") Motion for Summary Judgment filed on February 17, 2012. Also pending before the Court is Timothy Daubert's ("Plaintiff") Cross-Motion for Summary Judgment filed on February 17, 2012.[1] A hearing on the motions was scheduled for March 23, 2012. The Court took this

---

[1] This Court is issuing decisions on these dispositive motions because both parties consented to magistrate judge jurisdiction on April 7, 2010. (Docs. 17 and 19). It is also noted that this is a non-jury case because Plaintiff did not timely request a jury trial. (Doc. 42 at pg. 4).

matter under submission pursuant to Local Rule 230 (g).  Upon a review of all of the pleadings, Defendant's Motion for Summary Judgment is GRANTED.  Plaintiff's Cross-Motion for Summary Judgment is DENIED.

## II.     Summary of Plaintiff's Claims

Plaintiff's Second Amended Complaint alleges he is paralyzed from the waist down and uses a wheelchair for mobility.  He contends that he has attempted to attend football games at the Lindsay High School Stadium for several years but is prevented from doing so because the bleacher seating is not accessible to wheelchair users.  Specifically, Plaintiff alleges that he was able to attend the games, however, he was only able to view the game from the ground level which is a different vantage point from the other spectators sitting in the bleachers.  He argues that this seating is inferior because he either has to look through a gate, or his view of the game is blocked by other bystanders, coaches, and players walking in front of him.  Plaintiff stopped attending the games and complained to the school district, but he alleges the district took no action.

As a result, Plaintiff alleges violations of the American with Disabilities Act, 42 U.S.C. § 12132 ("ADA"), and regulations promulgated thereunder at 28 C.F.R. Part 35 *et seq,* as well as a violation of the Rehabilitation Act, 29 U.S.C. § 794 ("RA").   Plaintiff seeks injunctive relief and requests that the district be required to provide accessible bleacher seating or programmatic access to persons in wheelchairs, actual damages, attorney's fees, and costs of the suit.

Pending before the Court is Defendant's Motion for Summary Judgment filed on February 17, 2012.  (Doc. 69).  On March 9, 2012, Plaintiff filed an Opposition.  (Doc. 71).  On March 16, 2012, Plaintiff filed a Reply.  (Doc. 73).

Also pending before the Court is Plaintiff's Cross-Motion for Partial Summary Judgment filed on February 17, 2012.[2]  (Doc. 70).  On March 9, 2012, Plaintiff filed an opposition to the motion. (Doc. 72).  Plaintiff filed a Reply on March 16, 2012.  (Doc. 74).   After the matter was

///

---

[2] Plaintiff is seeking injunctive relief in the Motion for Summary Judgment.

2

taken under submission, Defendant filed a Sur-Reply.[3] (Doc. 76). The Court has reviewed all of the documents listed above in rendering its decision.[4]

**III. Legal Standard**

Summary judgment is appropriate when it is demonstrated that no genuine issue as to any material fact exists, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [a]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catret*, 477 U.S. 317, 323 (1986).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a Summary Judgment Motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

In resolving cross-motions for summary judgment, the Court must consider each party's evidence. *Johnson v. Poway Unified School Dist.,* 658 F.3d 954, 960 (9th Cir. 2011). Plaintiff

---

[3] Defendant's Sur-Reply objects to new evidence and new arguments presented in Plaintiff's Reply. (Doc. 76). However, Defendant never requested permission to file a Sur-Reply nor is that procedure permitted under the Local Rules. L.R. 230. Therefore, Defendant's Sur-Reply is STRICKEN. Notwithstanding the above, Plaintiff is also not permitted to raise new arguments or present additional evidence in the Reply. Accordingly, the Court did not consider those new arguments or new evidence presented in Plaintiff's Reply for the first time.

[4] The Court carefully reviewed and considered all of the pleadings, including arguments, points and authorities, declarations, and exhibits. Any omission of a reference to an argument or pleading is not to be construed that this Court did not consider the argument or pleading.

3

bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty*, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

**IV.    Summary of The Parties Stipulated Undisputed Material Facts[5]**

1. The Lindsay Unified School District hosts high school football games, which are open to the public. The high school football games are held at the stadium at Lindsay High School. Document 68-1 is an overhead image of the football stadium at Lindsay High School. The image contains a mark in the upper corner indicating its geographic orientation. Document 68-2 through 68-9 are a series of pictures from various points around the stadium.

2. Documents 68-2 through 68-5 show the bleachers which are located south of the football field. The south side bleachers were constructed in 1971. The south side bleachers have never been reconstructed or altered.

3. The only entry into the structure of the south side bleachers ('the bleachers") is by the stairs. There is no ramp or lift to enable a person in a wheelchair to get into the bleachers. There is also no clear floor space within the structure of the south side bleachers where a wheelchair may be located.

4. There is a path consisting of concrete pavers leading from the parking lot (which is south of the stadium) into the stadium and around the facility. The playing surface of the football field consists of artificial turf. The artificial turf extends approximately 20 yards beyond the boundary of the football field on the north and south sides. The artificial turf extends approximately 5 yards beyond the boundary of the football field on the east and west sides. There is a chain link fence on the north and south sides of the turf, which separates the turf from the paved area. There are gates in the fence allowing access to the turf area at various points. On the east and west ends of the fields, behind each end zone, there is no fence separating the field and the paved area.

---

[5] The parties stipulated to the undisputed material facts as part of their motions. (Doc. 68).

5. There is no assigned or reserved seating at the Lindsay High School stadium for football games, and the district does not restrict or assign handicapped persons to any particular seating location.

6. The district offers three particular locations from which persons in wheelchairs are able to watch the game: (1) behind either end zone on either the grass or the pavers; (2) near the corner of the field, in any corner; and (3) along the sideline, near to the fence separating the turf and the pavers, at approximately either 25 yard line. Documents 68-10 through 68-13 contains three pictures taken on November 11, 2011, during a varsity football game. Document 68-10 shows the view from behind the end zone on the west side of the field. Document 68-11 shows the view from the southwest corner of the field. Document 68-12 shows the view from along the south sideline near to the fence separating the turf from the pavers, at approximately the 30 yard line. There are no fixed seats at any of these locations.

7. The routes to each of the locations identified in undisputed fact #6 are accessible to a wheelchair without the need to carry or lift the wheelchair.

8. Spectators in wheelchairs may also sit behind the fence, on the paved area, at any point along the fence.

9. Spectators in wheelchairs regularly attend the high school football games.

10. Frank Moreno has attended approximately 2-3 football games each season at the Lindsay High School stadium with his son Jeremy since approximately 2002. Jeremy uses a wheelchair for mobility.

11. Mr. Moreno and Jeremy usually sit behind the end zone on the eastern side of the stadium. From this location, they are able to watch and enjoy the football games. There is an unobstructed view of the action. The location is near to where food is served, and other spectators tend to congregate in the area to watch the games. Mr. Moreno and Jeremy are able to enter and leave this location freely while the game is in progress.

12. Mr. Moreno and Jeremy also occasionally sit at the southwest corner of the field. From this location, they are able to watch and enjoy the football games. There is an unobstructed view of the action. The location is near to where food is served. When at this location, they are normally joined by additional friends and family. Mr. Moreno and Jeremy are able to enter and leave this location freely while the game is in progress.

13. Mr. Moreno believes that he and Jeremy are a safe distance from the action on the field at each location where they regularly sit. In all of the games attended by Mr. Moreno, he has never been in a situation where a football player, or a football, has left the boundaries of the football field and come close to contacting him or Jeremy.

14. Frances Loyd has regularly attended high school football games at the Lindsay High School stadium with her late husband, Dink Loyd. Dink began using a wheelchair for mobility in approximately 2003, and he passed away in 2008. From 2003 to 2008, Mr. and Mrs. Loyd attended nearly every high school football game at the Lindsay High School stadium.

15. Mr. and Mrs. Loyd attended multiple games at the Lindsay High School stadium during the 2007 season, which was the first season after the concrete pavers and artificial turf playing surface were installed.

16. Mr. and Mrs. Loyd always sat along the sideline on the south side of the field. Mr. and

      Mrs. Loyd would usually sit around the 30 or 40 yard line. They sat on the artificial turf, but near to the fence separating the turf from the pavers. From this location, they were able to watch and enjoy the football games. There was an unobstructed view of the action. They were able to enter and leave this location freely while the game was in progress.

17. Mrs. Loyd believes that she and Mr. Loyd were a safe distance from the action on the field at the location where they regularly sat. In all of the games attended by Mrs. Loyd, she was never in a situation where a football player, or a football, left the boundaries of the football field and came near to contacting her or Mr. Loyd.

18. Plaintiff uses a wheelchair for mobility.

19. Plaintiff moved to Lindsay in 1997 and first went to a football game at the Lindsay High School stadium that year.

20. Plaintiff last attended a football game at the Lindsay High School stadium in 2005.

21. Plaintiff has been to the Lindsay High School football stadium since 2005 to inspect the stadium. Plaintiff has inspected the stadium since the installation of the artificial turf and the concrete pavers.

22. Plaintiff wanted to attend football games at the Lindsay High School football stadium and sit in the bleachers each year since 2005 but has chosen not to do so because of the lack wheelchair seating in the bleachers.

In addition to the stipulated material facts, upon a review of the evidence, the Court finds that the following facts are undisputed :

23. When Mr. Daubert attended games at the high school prior to 2005 he was only able to watch the game from the ground level parked on the walkway. Mr. Daubert tried to move down the sideline but no matter where he placed his wheelchair, he had to deal with either looking through a gate, people walking in front of him, or players and coaches standing on the sidelines obscuring his view of the play. (Doc. 70-3).

24. The stadium style bleachers do not comply with the Department of Justice Americans with Disabilities Act Accessibility Guidelines "ADAAG." (Doc. 70-4).

25. Persons in wheelchairs are permitted to sit with a companion on the field during football games. (Doc. 70-3); UMF 11 and 16.

**V.    The Parties' Positions**

    *A.    Defendant's Motion for Summary Judgment*

In Defendant's Motion for Summary Judgment and in its opposition to Plaintiff's Cross-Motion for Summary Judgment, Defendant argues that the stadium does not violate the ADA or the RA. Specifically, because the bleachers at the stadium have not been modified since 1972, the seating qualifies as part of an existing facility and falls under the Department of Justice's "existing facilities" guidelines. Existing facilities are bound by the "program access standard"

which mandates that a public entity operate services, programs, or activities that are readily accessible to and usable by individuals with disabilities. Under this standard, the program is viewed in its entirety.

Defendant argues that the district has developed methods that allow wheelchair users to have meaningful access to watch and enjoy football games at the stadium. This is evidenced by the fact that there are three places throughout the facility where persons in wheelchairs can view and participate in football games. In support of its position, Defendant has offered the declarations of family members of two persons in wheelchairs who have attended games with some frequency in the past. These witnesses state that they have watched games at these locations on several occasions and that they are able to watch and enjoy the games with others in a safe environment. Defendant asserts that these accommodations meet the standards under the ADA and the RA. Accordingly, Defendant requests that summary judgment be entered in its favor.

### B.     *Plaintiff's Cross-Motion for Summary Judgment*

In opposition to Defendant's Motion for Summary Judgment and in support of his Cross-Motion for Summary Judgment, Plaintiff argues the district has violated the ADA because it provides stadium bleacher seating for the fans of football games, however, these seats are inaccessible to wheelchair users. Instead, wheelchair users must view the game from the sidelines or end zones which segregates wheelchair users. Moreover, these locations do not have the required companion seating and do not provide a line of sight comparable to the general public.

Plaintiff argues that he enjoys sporting events but he was frustrated when he attended football games at Lindsay High school because he could only view the game from the ground level. No matter where he placed his wheelchair, he had an inferior view of the field that required him to either look through a gate, or resulted in other people walking or standing in front of him.

Plaintiff contends that the district's accommodations do not comply with Title II because: (1) there is no ground level angle that is comparable in quality and convenience to the elevated

stadium seating, (2) he would like to sit with other Lindsay fans who share a common interest with him, and (3) because of the lack of companion seating, he is not able to sit with those accompanying him unless they bring their own chair and surrender their view afforded by the elevated stadium styles seating.

In support of his position, Plaintiff contends that the ADAAG require that a certain percentage of stadium style seating must comply with accessibility standards.  An accessible wheelchair space is one that has a minimum clear ground floor space and has at least one companion fixed seat next to each area.  A line of sight that is comparable to that offered by the general public must also be provided.  Plaintiff argues that the district has done nothing to make bleacher seating available to him.  Instead, the district has placed him on the field to watch the football game which is not meaningful access under the law.  Accordingly, Plaintiff requests that the Court find that the district's wheelchair seating arrangement at the Lindsay High School stadium violates Title II of the ADA.  He requests an order requiring the district to install accessible bleacher seating.

**VI.   Legal Analysis**

   *A.   Preliminary Matters*

Plaintiff submitted a declaration in support of his Motion for Summary Judgment.  *See*, Declaration of Timothy Daubert dated February 15, 2012.  (Doc. 70-3).   In response, Defendant submitted numerous evidentiary objections and disputed several facts contained in Plaintiff's declaration.  (Docs. 72-1, 73-1).  This order contains the facts that Court has found to be admissible and undisputed after considering Defendant's objections.

Additionally, Defendant objects to the admission of the declaration prepared by Plaintiff's expert, Paul Bishop, on the basis that the declaration contains opinions regarding the seating arrangements on the field that were not included in the initial expert report.  *See*, Declaration of Paul Bishop, dated February 16, 2012.  (Doc. 70-4).  Plaintiff never responded to this objection and a review of the documents reveals that paragraphs 7 and 8 of the declaration contains opinions that were part of the initial expert opinion.  (Docs. 70-4, 73-1, 73-2, 73-3).  Despite Plaintiff's failure to disclose this portion of the expert's report, the Court will not exclude the

evidence at this stage of the proceedings.  The conclusion of the expert is that the stadium seating does not comply with the ADAAG.  Failure to produce this evidence is harmless because as stated in this order, the ADAAG are only informative and are not mandatory for existing facilities.[6]

Finally, Defendant's objection to the admissibility to the deposition transcript of Dan Zoldak dated November 7, 2011 is overruled.  (Docs. 70-5 and 72-2).  The Court has considered this evidence.

### B.   Title II of the ADA and the Rehabilitation Act

Title II of the ADA and section 504 of the Rehabilitation Act "both prohibit discrimination on the basis of disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002).  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity." 42 U.S.C. § 12132.  Similarly, section 504 of the RA provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U. S. C. § 794.

"To establish a violation of Title II of the ADA, a plaintiff must show that (1) [he] is a qualified individual with a disability; (2) [he] was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities; and (3) such exclusion or discrimination was by reason of [his] disability." *Lovell v. Chandler*, 303 F.3d at 1052.  "To establish a violation of section 504 of the RA, a plaintiff must show that (1) [he] is

---

[6] Rule 26(a)(2)(B) provides that "unless stipulated or ordered by the court [the disclosure of the identity of expert witnesses pursuant to Rule 26(a)(2)(A)] must be accompanied by a written report.  Fed. R. Civ. P. 26(a)(2)(B).  The report shall contain, among other things, a "complete statement of all opinions to be expressed and the basis and reasons for them" and the data or other information considered by the witness in forming the opinions.  Fed. R. Civ. Proc. 26(a)(2)(B).  A party who fails to properly disclose its experts and their reports may be barred from using any of the expert's direct testimony unless there was "substantial justification" for the failure to disclose or the failure was "harmless." Fed. R. Civ.Proc. 37(c)(1).  While violations of Rule 26 may result in sanctions, including the exclusion of evidence, preclusion is a harsh consequence and should be used only when other alternatives are not available. *R &R Sails, Inc. v. Insurance Company of the State of Pennsylvania*, 673 F. 3d 1240 (9th Cir. 2012).  In this instance, the admission of this evidence is harmless for the reasons stated above.

9

handicapped within the meaning of the RA; (2) [he] is otherwise qualified for the benefit or services sought; (3) [he] was denied the benefit or services solely by reason of [his] handicap; and (4) the program providing the benefit or services receives federal financial assistance." *Id.* Title II of the ADA was expressly modeled after section 504 of the Rehabilitation Act. The Ninth Circuit has therefore observed that "[t]here is no significant difference in the analysis of the rights and obligations created by the ADA and the Rehabilitation Act." *Pierce v. County of Orange*, 526 F. 3d 1190, 1216 fn 27 (9th Cir. 2008).

*Existing Facilities under the ADA*

Under Title II of the ADA, each facility or part of a facility that is built or altered after 1992 must be readily accessible to and useable by persons with disabilities. 28 C.F.R § 35.151. When enacting the ADA, Congress acknowledged that some public entities operating existing structures would be unable to comply with the ADA and the ADAAG. Therefore, the regulations promulgated by the United States Attorney General differentiate between structures built prior to January 1992, the effective date of the Act ("existing facilities"), and facilities built or altered after January 1992. *Tennessee v. Lane*, 541 U.S. 509, 531-532 (2004). Facilities built or structurally modified after the effective date of the ADA are governed by 28 C.F.R § 35.151 and must comply with the ADAAG.[7]  However, existing structures must comply with 28 C.F.R § 35.150 which is a less stringent regulatory scheme. *Kinney v. Yerusalim*, 9 F.3d 1067, 1071 (3d Cir. 1993) (While § 35.150 embodies a "flexible concept" of compliance for existing facilities, § 35.151 imposes "substantially more stringent" requirements).

More specifically, the ADA standards for existing facilities provides that "a public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible and usable by individuals with disabilities." 28 C.F.R. § 35.150 (a)(1). This mandate may be met by a variety of means, which may not necessarily

---

[7] To satisfy § 35.151, a public entity may comply with either UFAS, 41 C.R.R. Pt. 101-19.6, App. A, or with the ADAAG, 28 C.F.R. Pt. 36, App. A. Even though compliance with either the ADAAG or UFAS is considered satisfactory, the regulations allow for "[d]epartures from particular requirements of either standard by use of other methods ... when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided. 28 C.F.R. § 35.15 (c).

1  include structural changes in existing facilities.  For example, 28 C.F.R. § 35.150(b) (1) provides
2  as follows :

> (b) Methods -- (1) General. A public entity may comply with the requirements of this section through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities. A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section. A public entity, in making alterations to existing buildings, shall meet the accessibility requirements of 35.151. In choosing among available methods for meeting the requirements of this section, a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate.
> 28 C.F.R. § 35.150(b) (1).

Moreover, even though existing facilities are subject to a lesser standard, mere physical access is not sufficient, Title II requires public entities to provide "meaningful access" to their programs and services.[8] *See, Lonberg v. City of Riverside*, 571 F. 3d 846, 851 (9th Cir. 2009) ("[The] prohibition against discrimination is universally understood as a requirement to provide 'meaningful access'." ); *Chaffin v. Kansas State Fair Bd.*, 348 F. 3d 850, 857 (10th Cir. 2003).

The crux of Plaintiff's arguments is that "program access" is more than just the ability to watch the football game at the stadium.  Instead, Plaintiff contends that meaningful access requires that wheelchair users be permitted to experience the game from the same viewing angle as the rest of the public seated in the bleachers.  In support of that argument, Plaintiff relies on the ADAAG § 4.1.3.9(a), which mandates that a certain percentage of the seating comply with the accessibility standards.  Under the ADAAG, an accessible wheelchair space is one that has a fixed companion seat and provides a line of sight that is comparable to that offered to the general

---

[8] Although Plaintiff asserts that Defendant misstates the law in its opening brief by arguing that Plaintiff must establish he was "entirely denied participation in the program," Plaintiff is mistaken.  It is clear from Defendant's pleading that it has acknowledged the necessity of providing "meaningful access." *Compare* (Doc. 71, pg. 4-5 *to* Doc. 69 pg. 13).

public. [9] ADAAG § 4.33.2-3.  While the Court is sympathetic to Plaintiff's plight, it does not agree with Plaintiff's interpretation of the law for several reasons.

First, Plaintiff correctly notes that while the ADAAG are not binding on existing structures, they can be used as guidance to assess program accessibility standards.  *See, Flynn v. Doyle*, 672 F. Supp. 2d 858, 879–80 (E.D. Wis. 2009); *Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221, 226 (S.D.N.Y.1999) ("[E]ven though only new construction and alterations must comply with the [s]tandards, those [s]tandards nevertheless provide valuable guidance for determining whether an existing facility contains architectural barriers.").  However, the mere fact that an existing facility does not comply with the ADAAG, does not render the program inaccessible.  Instead, assessing a program's accessibility is a subjective evaluation that entails viewing the program in its entirety.

Plaintiff asserts that the seating itself must be examined when determining whether the football game is readily accessible and usable by individuals with disabilities.  According to Plaintiff, the program is the ability to view the game from the bleachers with the rest of the spectators.  As such, the barriers around the bleacher seating must be removed, or alternative bleacher seating must be made available.  However, this limited view requires the Court to find that the bleacher seating is the program offered.  To the contrary, spectators do not go to the high school stadium to just sit in the bleachers; spectators sit in the bleachers to watch the football game.  The football game is the program offered, not the seating.  The seating is part of the facility.  Plaintiff's approach would render the "program access" standard meaningless because it would require that public entities modify existing facilities whenever the general public seating area was not accessible or ADAAG compliant.  These required structural modifications for existing facilities is what Congress meant to avoid when it created different standards for facilities built or modified before and after the enactment of the ADA.  *Greer v. Richardson*

---

[9] Plaintiff also relies on the Department of Justice publication regarding accessible stadiums which documents ADA accessibility requirements that apply to *new* stadiums, http://www.ada.gov.stadium.pdf.  (Doc. 70-6).  However, because this memorandum specifically addresses new stadiums, it is not binding in this case for the reasons outlined in this order.

*Independent School District*, 2012 WL 833367 * 6 (5th Cir. March 14, 2012 ). This tenet is also articulated in the ADA Technical Assistance Manual § 5.2000 which states the following :[10]

> Unlike private entities under Title III, public entities are not required to remove barriers from each facility, even if removal is readily achievable. A public entity must make its "programs" accessible. Physical changes to a building are only required when there is no other feasible way *to make the program accessible*.
>
> *Department of Justice, Technical Assistance Manual to Title II of the ADA*, (1994) § 5.2000 available at http://www.ada.gov/tama2.htm section II-5.0000.

Thus, the question in this case is not whether the bleacher seating is accessible to wheelchair users, but whether the football games are accessible when they are viewed in their entirety. A review of the facts reveals that the answer is yes.

First, it is undisputed that there are no barriers preventing wheelchair access from the parking lot to the field. Moreover, once an individual enters the stadium, the handicapped seating on the field is accessible to wheelchair users. UMF 7. Wheelchair users are not required to sit in one area on the field but can view the game from a variety of locations including : 1) from either end zone, 2) from any corner of the field, or 3) at either of the 25 yard lines.[11] UMF 5 and 6. Some of these options include sitting behind a fence while others do not. UMF 4, 6 and 8. Although there is no fixed companion seating per se, wheelchair users can also sit and enjoy the game with companions in areas close to where food is served, as well as where spectators

---

[10] Plaintiff relies on two illustrations from section 5.1000 from the ADA Technical Assistance Manual ("the manual") in support of his position that barriers in the stadium seating must be removed or the football game must be relocated. The first illustration indicates that when a city holds a public meeting in a building, the city must ensure that the meeting room is accessible to disabled individuals including access to telephones and restrooms. The second illustration indicates that when a person is unable to climb stairs, a public courthouse is required to either have an elevator, or if no elevator is available, it must relocate the proceedings to a ground level in the courthouse, or move the proceedings to another building. (Doc. 70-1 at pgs. 6-7). However, neither of these illustrations require that the public entity provide the exact seating arrangement to a disabled person as that offered to the general public. All that is required is that the disabled individual have access to the program offered.

Moreover, as noted by Defendant, Illustration number 2 from section 5.2000 of the manual indicates that public entities are not required to remove physical barriers as long as access to the program is available. For example, the manual advises that access to books in a library is provided to a wheelchair user when the stacks of books are located on an upper floor but the books are brought down to the person in the wheelchair by library staff. Although this accommodation deprives wheelchair users of the opportunity to go to the stacks of books themselves as other non-disabled individuals do, they still have access to the books which is the program offered. (Doc. 73 at pg. 6).

This illustration in the library is similar to the bleacher seating at the football stadium. Although wheelchair users do not have the exact same experience as other non-disabled spectators, they are still able to have meaningful access to football games.

[11] It appears that Plaintiff can also sit on the 30 and 40 yard lines as well. UMF 16.

13

congregate. UMF 11, 12, and 16.   Under these conditions, wheelchair users can attend the game and have meaningful access to the program offered.

   As the moving party for his cross-motion for summary judgment, and as the party with the burden of persuasion at trial, Plaintiff must establish "beyond controversy every essential element of its" his affirmative claims.  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (quoting W. Schwarzer, California Practice Guide: Federal Civil Procedure Before Trial § 14:124-127 (2001)).  In other words, Plaintiff has the burden to establish that the football game is not accessible to wheelchair users.  Similarly, as the non-moving party, in response to Defendant's motion for summary judgment, Plaintiff must present affidavits or other evidence to show that genuine disputed issues of material facts exist with regard to program access.

   Plaintiff has attempted to meet these burdens through his own declaration stating that when he attended a football game in 2005, his view from the field was obstructed by a gate and/or people walking or standing in front of him.  However, these claims are rebutted by Plaintiff's own stipulated facts indicating that individuals who have sat in the designated wheelchair seating areas since 2005 have had unobstructed views of the game.  UMF 12 and 16.  Given this stipulation, Plaintiff cannot argue that unobstructed views in various places on the field do not exist.  Furthermore, although Plaintiff's view could have been obstructed intermittently based on others standing in front of him while sitting on the field level, this situation could also arise if he were sitting in the bleachers as other spectators get in and out of their seats.

   Moreover, Plaintiff's expert testimony is also insufficient because the expert offers no opinion on whether the district provides program access to wheelchair users separate from the alleged lack of compliance with the ADAAG.  Again, this expert opinion is limited as the ADAAG are not mandatory for existing facilities.  Furthermore, the expert focuses on the non-accessibility of the bleachers and seating as part of the facility rather than on whether the football game itself is accessible.  For example, the expert contends that there is no comparable line of sight as required by the ADAAG which in relevant part provides as follows :

> Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public.

28 C.F.R. Pt. 36, App. A, § 4.33.3.

The interpretation of the meaning of "comparable lines of sight" has been controversial because for a period of time the Department of Justice ("DOJ") had not issued clarification on the issue. As a result, courts attempted to define the term. Some Circuit courts have found that "comparable lines of sight" means an unobstructed view, while other Circuits have found that "comparable lines of sight" means "comparable viewing angles." The Ninth Circuit has adopted the DOJ's eventual interpretation of this guideline which defines comparable lines of sight to mean comparable viewing angles. *Oregon Paralyzed Veterans v. Regal Cinemas*, 339 F. 3d 1126, 1133 (9th Cir. 2003). However, in *U.S. v. AMC Entertainment*, 549 F. 3d 760 (9th Cir. 2008), the Ninth Circuit limited this interpretation based on the date of the construction of the structure. Specifically, the Court held that there was a violation of due process by requiring that movie theaters retrofit their seating if the theater was newly constructed after the enactment of the ADA, but prior to the DOJ's clarification of the guideline, because there was not sufficient notice of the requirements of the law. *U.S. v. AMC Entertainment*, 549 F. 3d at 768-769. Thus, any facility that was newly constructed or altered prior to the date that DOJ clarified its position, which was in 1998, could comply with the ADAAG by providing "unobstructed views" to wheelchair movie goers. Given that the bleachers were constructed in 1971, requiring the district to provide Plaintiff with comparable viewing angles would impose a higher standard than what is required under Ninth Circuit case law. Accordingly, the district has met its duty.

Plaintiff's expert also asserts that the bleachers and the seating on the field do not comply with the ADAAG because there is no fixed companion seating. However, the undisputed facts establish that while there is not a fixed companion seat on the field, wheelchair users may sit with others who have accompanied them to the game. Given that the ADAAG are not mandatory, this accommodation is sufficient.

Finally, the Court is not persuaded by Plaintiff's argument that Defendant has done nothing to modify the facility to make the football games accessible to the him. Under the

existing structure standard, the district need not make physical modifications if the program is accessible. Although the district did not make structural modifications to the facility, it has developed a plan that accommodates wheelchair users. It has designated several different areas where wheelchair users may sit with a companion and have an unobstructed views of the game. This allows Plaintiff and other wheelchair users to have meaningful access to football games. Although Plaintiff cannot sit in the bleachers where he prefers, the accommodation provided satisfies the existing facility access standard. Where physical presence is coupled with an opportunity to participate in the activity, the public agency has met its requirement to provide program access, even if the level of access provided is not the most optimal or convenient. *See, Association for Disabled Americans v. City of Orlando*, 153 F. Supp. 2d 1310, 1320-1321 (M.D. Fla., 2001). Given the above, Plaintiff has not met his burden of establishing a violation of Title II of the ADA, nor has he created a disputed genuine issue of material fact.

As previously noted, there is not a significant difference in the analysis of the rights and obligations created by the ADA and the Rehabilitation Act. *Pierce v. County of Orange*, 526 F. 3d 1190, 1216 at fn 27 (9th Cir. 2008). Since the Court has found in favor of Defendant on Plaintiff's ADA claims, it similarly finds in favor of Defendant's on the Rehabilitation Act claims.

///
///
///
///
///
///
///
///
///

///

///

### VII. Conclusion

Based on the foregoing, IT IS HEREBY ORDERED that :

1) Defendant's Motion for Summary Judgment (Doc. 69) is GRANTED;

2)  Plaintiff's Cross-Motion for Summary Judgment (Doc. 70) is DENIED;

3) Defendant's Motion to Strike Plaintiff's Reply filed on March 20, 2012 (Doc. 76) is DENIED; and

4) Defendant's Sur-Reply (Doc. 76) is STRICKEN.

The Court **DIRECTS** the Clerk to enter judgment in favor of Defendant Lindsay Unified School District and against Plaintiff Timothy Daubert, and to close this case.

IT IS SO ORDERED.

**Dated:**   **May 4, 2012**                                **/s/ Gary S. Austin**
                                                                    UNITED STATES MAGISTRATE JUDGE